**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                       )
SHARON VIVEIROS,                       )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        Civil Action No. 10-11902-DJC
                                       )
MICHAEL J. ASTRUE,                     )
COMMISSIONER OF SOCIAL SECURITY,       )
                                       )
        Defendant.                     )
_____)


**MEMORANDUM AND ORDER**

CASPER, J.                                              September 19, 2012

## I.      Introduction

Plaintiff Sharon Viveiros ("Viveiros") brings this action for judicial review of the final

decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the

Commissioner"), issued by an Administrative Law Judge ("ALJ") on June 2, 2010, denying her

claim for Social Security disability insurance benefits ("SSDI").  Before the Court are Viveiros'

Motion to Reverse and the Commissioner's Motion to Affirm that decision.  In her motion, Viveiros

claims that the ALJ erred in denying her claim because the ALJ's decision was not based on

substantial evidence in that the ALJ:   I) failed to incorporate his finding of moderate difficulties in

concentration, persistence, and pace into the RFC assessment and the hypothetical questions to the

vocational expert at Viveiros' hearing; ii) improperly weighed the opinion of Viveiros' treating

physicians; iii) failed to incorporate Viveiros' prior claim for SSDI as well as her subjective

1

statements into his RFC assessment; iv) failed to address Viveiros' medications and their side effects; and v) failed to obtain additional medical source statements from Viveiros' treating or consulting physicians.   For the reasons stated below, the Commissioner's motion to affirm is GRANTED in part and DENIED in part and Viveiros' motion to reverse is GRANTED in part and DENIED in part and this case is REMANDED to the ALJ.

## II.        Factual Background

Viveiros was fifty-two when she stopped working on March 18, 2006.  R. 128.[1]  She had previously worked as a day care worker, hotel housekeeper, laundry presser, and printer at an art company.  R. 129.  In her March 14, 2007 application for SSDI with the Social Security Administration ("SSA"), she alleged disability due to vision problems, depression, back and neck pain, degenerative disc disease, asthma, migraines, numbness in her face, and pinching in her right leg. R. 128.

## III.        Procedural Background

Viveiros filed a claim for SSDI with the SSA on March 14, 2007, asserting that she was unable to work as of March 18, 2006. R. 7, 103, 124.[2]  After initial review, her claims were denied on December 19, 2007.  R. 65.  Her claims were reviewed by a Federal Reviewing Official and again denied on November 18, 2008.  R. 61-64.  Viveiros filed a timely request for a hearing before an ALJ pursuant to SSA regulations.  R. 72.  A hearing was held before an ALJ on May 3, 2010. R. 23-

---

[1]The administrative record is referred to as "R." and is contained in the docket at D. 8.

[2]Viveiros previously filed a claim for disability insurance benefits in 2004, alleging disability since September 2003.  An ALJ conducted a hearing, and Viveiros' claim was denied in 2006. That decision was affirmed by a federal district court in 2009.  Viveiros v. Astrue, No. 06-419-T, 2009 WL 196217 (D.R.I. January 23, 2009).

55. In a written decision dated June 2, 2010, the ALJ determined that Viveiros was not disabled and denied her claims. R. 7-17. Although the ALJ notified Viveiros that the SSA's Decision Review Board selected her claim for review, R. 4, the Decision Review Board did not complete review of Viveiros' claim during the requisite time period. R. 1. Accordingly, the ALJ's decision is the Commissioner's final decision. Id.

## IV.     Discussion

### A.     Legal Standards

#### 1.     Entitlement to Disability Benefits

A claimant's entitlement to SSDI turns in part on whether she has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(I), 423(d)(1)(a); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do her previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920. All five steps are not applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for

one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted. Id.

### B.    Standard of Review

This court has the power to affirm, modify, or reverse a decision of the Commissioner. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted).

### C.    Before the ALJ

#### 1.    Medical History

##### a.    Vision Problems

Viveiros began having vision problems prior to undergoing surgery for a benign tumor of

her right parotid salivary gland on September 24, 2003.  R. 331.  Although Viveiros made an

"excellent recovery" from the surgery, id., she continued to suffer from visual impairments such as

exotropia (a condition in which the eyes are misaligned) and diplopia (double vision), R. 332, which

her surgeon stated would be an "impediment to her having meaningful work."  R. 331.  Viveiros

consulted an ophthalmologist for her vision problems.  R. 331-333.  Her last appointment with the

ophthalmologist took place on March 1, 2004.  R. 333.  Since that time, she continued to complain

of vision problems during appointments with her primary care physician, Dr. Vladimir Yufit, in

February, R. 221, and September 2007.  R. 219.  She also consulted a neurologist, Dr. Farrel

Douglas, and reported visual impairments to him in April 2007.  R. 229-230.  In July 2009, Dr. Yufit

stated that she had "permanent visual impairment." R. 198.

### b.    Migraines

Viveiros began experiencing severe headaches after her surgery in 2003.  R. 347.  The

frequency of her headaches has varied in the years since.  She reported migraines to Dr. Yufit in

February 2007.  R. 221.  Dr. Douglas found in April 2007, during her first visit with him, that

Viveiros suffered from "chronic migraines, possibly due to the overuse of Tylenol."  R. 229.  She

reported to him that she had headaches daily; she was taking Tramadol for her headaches, but stated

that it was not helping.  Id.  Dr. Douglas recommended that she stop taking over-the-counter

medications and prescribed Phenergan, Skelaxin, and Nortriptyline.  Id.  He also gave Viveiros a

handout to read on rebound headaches.  Id.  During her next visit, in July 2007, Viveiros reported

to him that she experienced headaches about twice a week and attributed most of them to neck pain.

R. 227.  Dr. Douglas recommended that she continue taking Phenergan and Flexeril, a muscle

relaxant, and to discontinue Nortriptyline, as Viveiros reported that it was causing nausea and

insomnia.  Id.  He also put her on a trial of Verapamil.  Id.  At her third appointment, in September 2007, Dr. Douglas instructed her to continue taking Verapamil, Phenergan, and Flexeril.  R. 225. He reported "mild improvement" in Viveiros' condition from this medication.  Id.  At that time, Viveiros reported that she was experiencing about three headaches per week and was not experiencing headaches when she woke up each morning.  Id.  Viveiros also reported to Dr. Douglas that she had stopped taking Skelaxin because it was too expensive.  Id.  Dr. Douglas recommended alternative therapies for Viveiros' migraines, such as yoga, craniosacral therapy, and massage.  Id. Viveiros also reported migraines to Dr. John Jao, a non-examining physician, in the course of his physical residual functional capacity assessment of her in October 2007.  R. 242-243.

### c.      Physical pain

Dr. Joseph Doerr stated in his December 2005 report that Viveiros had "a long, somewhat unusual story of . . . upper back and head problems," and that she had experienced numbness of her right leg, possibly due to back pain, one year previously.  R. 254.  He also reported that although she had "good strength and functional range of motion," she nevertheless had trouble with household chores and that she was "chronically disabled in terms of some fine motor and visual work."  Id. He opined that she suffered from "chronic radiculopathy" in her right leg, R. 255, and that he would try to "coerce" her into physical therapy.  Id.  In subsequent 2006 appointments, Dr. Doerr reported that he found "chronic low back pain," and "some restriction" around Viveiros' right shoulder and spine.  R. 250-251.  At Viveiros' final appointment with Dr. Doerr in August 2006, he reported that her symptoms included numbness of her right thigh, weakness of her right foot, and persistent dizziness.  R. 249.  He also questioned her straight-leg raise.  Id.  In December 2008, Dr. Doerr completed a "Physical Capacities Evaluation" on Viveiros' condition in which he indicated that she

could sit, stand, and walk for 3 hours at a time, or a total of 6 hours during an 8-hour day.  R. 352.

He also indicated that she could never lift or carry more than 10 pounds, that she was able to pull

and push properly with her arms and legs, and that she could occasionally climb or reach, but never

bend, squat, or crawl.  Id.  Finally, he stated that Viveiros could have mild exposure to changes in

temperature and humidity, dust, fumes, and gases, and driving automotive equipment.  Id.

Viveiros then began seeing Dr. Douglas in April 2007.  Dr. Douglas indicated that Viveiros'

myofascial neck pain "likely aggravates and perpetuates" her migraines.  R. 229.   He also

acknowledged lower leg pain and cramps that cause her pain when walking and standing, though

he stated that the origin of this pain was "unclear."  Id.  Dr. Douglas prescribed medications, and

advised Viveiros to apply ice to her neck to relieve the pain.  Id.  At subsequent 2007 appointments,

Dr. Douglas reiterated his belief that Viveiros' neck pain was contributing to her migraines.  R. 227.

He wrote in September 2007 that Viveiros reported always feeling exhausted.  R. 225.

Viveiros completed a "Questionnaire on Pain" in October 2007 in which she reported

experiencing pain "mostly all the time" in her neck, back, and face.  R. 167.  She described the

medications that she took for the pain and their side effects, stating that the medications were

prescribed by Dr. Yufit.  Id.  According to her answers, the pain prevented her from leaving her

home and she needed help with housework cooking and shopping.  R. 168.

Viveiros also complained about myofascial pain to Dr. Yufit.  In August 2007, she reported

lower back pain to him; Dr. Yufit's notes indicate that the pain was "sharp" and "aggravated by

bending."  R. 220.  In 2009, tests revealed that Viveiros had no acute traumatic injury to the spine

or facial bones.  R. 290-291.  Dr. Yufit completed a statement for Viveiros' long-term disability

carrier in July 2009 indicating that Viveiros' marked limitations included back pain, neck pain, and

right shoulder pain.  R. 198.  He also stated that she could lift or carry no more than 10 pounds, stand and/or walk for no more than 3 hours per day, sit for no more than 3 hours, and that she was limited in her ability to push, pull, climb, bend, and stoop.  Id.

Dr. Jao reviewed evidence in the record and filled out a Physical Residual Functional Capacity Assessment in 2007.  He stated that Viveiros could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand, walk and sit for up to 6 hours in an 8-hour workday; and push and pull without limitation.  R. 242.  Dr. Jao stated that an MRI of Viveiros' spine indicated "minor degenerative changes without neural impingement."  Id.  He opined that Viveiros had no postural limitations apart from occasional stooping and overhead reaching.  R. 243-244.

### d.    Depression

Dr. Yufit's notes from September to November 2005 indicate that Viveiros reported symptoms of anxiety and depression.  R. 219.  Notes from another appointment with him in February 2007 indicate that Viveiros was "tearful" due to the fact that Valentine's Day was the anniversary of her son's death.  R. 221.  Dr. Yufit noted a labile affect and diagnosed depression. Id.

Dr. Douglas' notes from April 2007 also describe Viveiros' depression.  He stated that Viveiros suffered from depression, anxiety, and mood changes, which likely contributed to her migraine headaches.  R. 229-230.  According to Dr. Douglas' July 2007 notes, Viveiros had taken Paxil in the past for depression, but was no longer taking it and was reluctant to take medications due to the possibility of weight gain.  R. 227.  Dr. Douglas' notes from Viveiros' July appointment also indicated that Viveiros stated that she was more emotional and cried more easily than in the past, although there is some suggestion that this may have been a side effect of another medication.

Id.

In the course of her application for SSDI, Viveiros was referred to Steven J. Hirsch, Ph.D., for a consultative psychiatric evaluation in November 2007.  Dr. Hirsch stated in his report that Viveiros was not taking any prescribed medications for depression at that time.  R. 259.  He stated that her social judgment and reasoning skills were functional.  R. 260.  However, he noted that during the appointment she frequently had trouble remembering specific dates, seemed anxious and depressed, and "had difficulty focusing, concentrating, and attending to many questions that were being presented to her."  R. 259.  Dr. Hirsch stated that overall, Viveiros "had some difficulty tolerating the interview process."  R. 260.  He noted that she reported to him that she experiences anhedonia (an inability to experience pleasure from activities usually found enjoyable).  Id.  He opined that she is under more psychological stress "than she has the inner resources to cope with," and that she has difficulty coping with "day-to-day" stresses.  Id.  He diagnosed a depressive disorder.  Id.

Several weeks later, in December 2007, Dr. Michael Maliszewski, a non-examining doctor, assessed the evidence in the record.  He noted that she was suffering from a "depressive disorder." R. 266.  He also noted her functional limitations, including mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence, and pace.  R. 273. In his Mental Residual Functional Capacity Assessment, under the category of "Sustained Concentration and Persistence," he indicated that she was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a regular schedule, maintain attendance, and be punctual; complete a normal workweek without interruptions and perform at a

consistent pace without an unreasonable number of rest periods; and respond to changes in the work setting.  R. 277-278.

Viveiros returned to Dr. Yufit for an appointment on February 10, 2009.  Dr. Yufit noted that she was crying and appeared "very upset and stressed out."  R. 287.  At that point her husband was afflicted with Stage IV gastric cancer.  Dr. Yufit's notes from a July 30, 2009 appointment state that Viveiros was experiencing greater depression as well as panic attacks since her husband died in May 2009. R. 286.  He also indicated that her physical symptoms were likely "aggravated" by her depression. Id.

### e.      Asthma

Dr. Yufit noted in May 2006 that Viveiros used an albuterol inhaler.  In November 2006, Viveiros underwent pulmonary function tests, which showed that her spirometry and lung volume were within "normal limits."  R. 209.  Dr. Yufit noted continuing symptoms of asthma in his records from December 2006 (R. 219) and February 2007 (R. 221).  Douglas also noted in his initial examination of her in April 2007 that Viveiros suffered from asthma.  R. 230.  Dr. Jao listed asthma as one of her conditions in his October 2007 RFC assessment, but found that her spirometry was normal other than "borderline low diffusion."  R. 243.

### 2.      ALJ Hearing

At the May 3, 2010 administrative hearing, the ALJ heard testimony from two witnesses, Viveiros and a vocational expert ("VE").  Viveiros testified that she worked as a hotel housekeeper, a laundry presser, and a printer at an art company, but that she stopped working the day before her surgery in 2003.  R. 30-31.  She testified that she suffers from migraine headaches "about twice a week," and "sometimes they. . . last four hours."  R. 44.  She testified that she is unable to sit for

longer than an hour at a time due to lower back pain, R. 32, and that she becomes dizzy if she stands

for longer than 15 minutes.  R. 33.  She testified that she gets short of breath walking up stairs and

walking more than a block.  R. 33, 47.  She testified that she could carry no more than five pounds,

and that her hands – particularly her right hand – are "a little numb."  R. 33, 34; <u>see</u> R. 37-38 (noting

that Viveiros is right-handed).  She further stated that she has problems stooping, squatting,

kneeling, bending, and climbing, and that she would have problems performing repetitive pushing

or pulling of arm and leg controls. R. 38.  She stated that she sometimes becomes nervous in crowds,

and has problems with stress, work pressure, memory, comprehension, complex tasks, and

concentration.  R. 40-41, 48.  She stated that cold, heat, dust, humidity, and fumes aggravate her

condition.  R. 41.  She stated that she does not cook or do other household chores such as cleaning,

grocery shopping, or yard work, R. 42, though she does laundry once a week.  <u>Id.</u>  She stated that

she usually stays in her home, R. 43, and that she spends most of her day lying down.  R. 47.

The VE testified about Viveiros' past work history as a laundry presser, printer,  and in hotel

housekeeping, all of which were characterized as light and unskilled work.  R. 46.  He also noted

that Viveiros has no transferrable skills to other professions.  <u>Id.</u>  After clarifying the scope of her

claimed limitations several times with Viveiros, R. 46-49, the ALJ asked the VE a hypothetical

question, that assuming he found Viveiros' testimony credible - i.e., that she could only sit for one

hour and stand for 15 minutes; has shortness of breath; has only the ability to walk a block or so;

was unable to lift and carry over five pounds; experiences problems writing because of numbness,

problems seeing, problems with repetitive pushing and pulling controls as well as stooping,

squatting, kneeling, bending, and climbing and problems handling stress and work pressure; has

memory problems and decreased concentration; has an inability to perform complex tasks; has

problems handling cold, dust, heat, humidity, and fumes; and would need to lie down most of the day - about what jobs she could perform.  R. 46-49.  The VE responded that under these conditions, Viveiros would be unable to perform any work.  R. 49.  However, the VE further testified, in response to the ALJ's second hypothetical question, that under different conditions - if an individual the same age and with the same education and work experience (as Viveiros) were able to lift 20 pounds occasionally and 10 pounds frequently; sit for six hours out of an eight-hour work day; stand and walk for six hours out of an eight-hour work day; occasionally stoop and reach above shoulder level; and perform only simple routine, repetitive tasks on a sustained basis in a stable work environment (defined by the ALJ as one where "the individual performs the same task around the same people, at the same place, and . . . where there is no requirement to perform complex detailed tasks"); but was unable to climb ladders, ropes, or scaffolding; tolerate moderate (but not concentrated) fumes, odors, dust, gases, or poor ventilation, and work around unprotected heights or dangerous moving machinery - such an individual would be able to return to Viveiros' past relevant work as a laundry presser and hotel housekeeper and other light, unskilled work available in the national economy.  R. 49-50.

### 3.      Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Viveiros did not engage in substantial gainful activity during the period from her alleged onset date of March 18, 2006, through her date last insured of September 30, 2009.  R. 9 at ¶ 2.  At step two, the ALJ found that through the date last insured, Viveiros had the following severe impairments: depression and myofascial pain syndrome in her back and neck.  Id. at ¶ 3.  At step three, the ALJ found that neither Viveiros' mental nor physical impairments met or medically equaled one of the

12

listed impairments in the Social Security regulations.  R. 11 at ¶ 4.  The ALJ determined that while

Viveiros' impairments could reasonably be expected to cause her alleged symptoms, her statements

concerning the intensity, persistence, and limiting effects of those symptoms were not credible.  R.

13.  He concluded that Viveiros had the residual functional capacity to perform light work in that

she can lift and carry up to twenty pounds; sit, stand, and walk for six hours each in an eight-hour

day, occasionally stoop, and is limited to performing simple, routine, repetitive tasks in a stable work

environment.  R. 12 at ¶ 5.  He found that she must avoid concentrated exposure to fumes, gases,

unprotected heights, and dangerous machinery and that she cannot perform complex tasks.  Id.  At

step four, the ALJ found that given this residual functional capacity, Viveiros was capable of

performing her past relevant work as a housekeeper and laundry presser.  R. 16 at ¶ 6.

### D.      Viveiros' Challenges to the ALJ's Findings

Viveiros contends that the case must be reversed and remanded because the ALJ's ruling was

not based upon substantial evidence because the ALJ:  I) failed to incorporate his finding of

moderate difficulties in concentration, persistence, and pace into both the hypothetical questions

posed to the VE at Viveiros' hearing and his RFC assessment; ii) improperly weighed the opinions

of Viveiros' treating physicians; iii) failed to incorporate Viveiros' prior claim for SSDI as well as

her subjective statements into his RFC assessment; iv) failed to address Viveiros' medications and

their side effects; and v) failed to obtain additional medical source statements from Viveiros'

treating or consulting physicians.  The Court now addresses each of these arguments in turn.

### 1.      Failure to Address Moderate Difficulties in Concentration, Persistence, and Pace in the Questions to the VE and in the RFC Assessment

Viveiros argues that the ALJ failed to incorporate the finding of her moderate difficulties in

concentration, persistence, and pace into both his questions to the VE at her hearing and his RFC assessment.  The ALJ recognized this finding in his opinion, R. 11, and highlighted no evidence in the record to the contrary.  As such, Viveiros argues, the ALJ should have asked the VE specifically about how this limitation would affect her ability to perform her past relevant work and subsequently addressed it in his RFC assessment.

The ALJ's hypothetical questions to the VE did not include reference to moderate difficulties in concentration, persistence, and pace.  It appears that the ALJ attempted to capture all of Viveiros' complaints in his first question to the VE during the hearing.  However, his first question – posing the hypothetical situation in which he credited all of Viveiros' complaints – was nevertheless lengthy and difficult to follow.  The ALJ interrupted his own question multiple times to elicit additional information from Viveiros about her conditions.  R. 47, 48, 49.  He restated Viveiros' conditions as she had alleged them, including that she would have decreased concentration and would be unable to perform complex tasks.  R. 48.  In response, the VE replied that with the limitations the ALJ described, Viveiros would be unable to perform any work.  R. 49.  The ALJ's second question indicated fewer restrictions on Viveiros' abilities and condition.  The ALJ made no specific mention of concentration, persistence, or pace in this question; he stated that Viveiros would have the ability to perform "only a simple routine competitive repetitive task . . . in a stable work environment," one in which there is "no requirement to perform complex detailed tasks."  R. 50. The VE replied that based on those limitations, Viveiros could perform her prior work as a laundry presser and hotel housekeeper.[3]

---

[3] The ALJ then further specified that Viveiros would be able to "tolerate moderate, but not concentrated" fumes.  The VE responded that "all sorts of jobs would be available in prior work, based on that."  R. 50.

For a VE's answer to a hypothetical question to be relevant, "the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities[.]" Arocho v. Sec'y of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). The ALJ must, therefore, "both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions." Id. "When an ALJ's hypothetical assumes that certain functional limitations do not exist, and when 'the medical evidence [does] not permit that assumption,' the ALJ cannot 'rely on the vocational expert's response as a basis for finding claimant not disabled.'" Lema v. Astrue, No. 09-11858-MLW, 2011 WL 1155195 (D. Mass. March 21, 2011) (quoting Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994)). Failing to include a functional limitation in a hypothetical question to a VE requires a case to be remanded. See Stanley v. Massanari, No. 00-577-JD, 2001 WL 873064, at *5 (D.N.H. July 31, 2001) (remanding where the hypothetical question to VE, upon which ALJ relied, included a limitation that the claimant would need a job with simple instructions but "did not adequately describe that she would often have deficiencies in concentration, persistence or pace resulting in her failure to complete tasks in a timely manner"); see also Rose, 34 F.3d at 19 (holding that an ALJ's omission of any mention of a significant functional limitation from a claimant's condition required remand); Allaire v. Astrue, No. 08-375-P-H, 2009 WL 3336107, at *7 (D. Me. Oct. 13, 2009) (holding that the absence of a hypothetical question to the VE that incorporated the ALJ's finding of "moderate difficulties in concentration, persistence, and pace" required remand).

The ALJ's questions to the VE did not adequately transmit the outputs of Viveiros' medical record on the issue of moderate difficulties in concentration, persistence, and pace. Dr. Michael Maliszewski made this finding in his Psychiatric Review Technique and Mental Residual Functional

Capacity Assessment, which he completed in December 2007.  R. 273.  More specifically, upon

reviewing the evidence in the record, Dr. Maliszewski indicated that under the general heading of

"Sustained Concentration and Persistence," Viveiros was moderately limited in her ability to

understand, remember, and carry out detailed instructions; maintain attention and concentration for

extended periods; perform activities within a regular schedule, maintain attendance, and be punctual;

complete a normal workweek without interruptions and perform at a consistent pace without an

unreasonable number of rest periods; and respond to changes in the work setting.  R. 277-278.  The

ALJ afforded "greatest weight" to Dr. Maliszewski's opinion in his decision, R. 15, and found that

Viveiros had moderate limitations in concentration, persistence or pace.  R. 11.[4]  Despite that weight,

the ALJ did not mention moderate difficulties in concentration, persistence or pace in his second

hypothetical question to the VE.  Instead, the ALJ limited Viveiros' work abilities in his second

hypothetical question to being able to "perform only a simple routine competitive repetitive task on

a sustained bas[is] over a normal eight hour work day in a stable work environment," which he

defined as one "where there is no requirement to perform complex detailed tasks."  R. 50.  While

Dr. Maliszewski wrote in his report that Viveiros would be able to perform simple tasks, R. 279, the

ALJ's phrases in his hypothetical are not adequate substitutes for the finding of moderate difficulties

in concentration, persistence, and pace.  See  Allaire, 2009 WL 3336107, at *7 n. 9; Stanley, 2001

---

[4]The Commissioner has suggested that the ALJ's finding of Viveiros' moderate limitations in
concentration, persistence and pace are determinations made by the ALJ at step two of the
analysis and the ALJ is "under no obligation to transfer his findings" at step two "into his RFC
determination at step four."  D. 15 at 13.  Although the determination that the ALJ is making at
step 2 is a threshold issue of severity, id.; see McDonald v. Sec'y of Health & Human Servs.,
795 F.2d 1118, 1122-24 (1st Cir. 1986), "an administrative law judge is directed to consider the
limitations caused by any existing impairment, whether or not determined at Step 2 to be severe,
at Steps 4 and 5."  Allaire, 2009 WL 3336107, at *7 n. 9 (citing 20 C.F.R. §§ 404.1545(e),
416.945(e)).  Accordingly, if an ALJ is to rely on the VE's opinion in his RFC determination, the
hypothetical questions to the VE must reflect the appropriate functional limitations.

WL 873064 at *5. Because of the inadequacy of the ALJ's hypothetical questions to the VE, the

VE's response – that Viveiros would be able to return to her past relevant work – is irrelevant, and

the case must be remanded on this basis.  Arocho, 670 F.2d at 375 (an improper question to the VE

renders the VE's answer to that question irrelevant).  Moreover, on remand, the ALJ shall address

the finding of Viveiros' moderate difficulties in concentration, persistence, and pace in his RFC.

Although the ALJ discussed Viveiros' ability as "limited to performing simple, routine, repetitive

tasks in a stable work environment" and her inability to "perform complex tasks, " R. 12-15, he did

not address the moderate difficulties in concentration, persistence, and pace in the RFC.

### 2.      Weight of the Treating Physicians' Opinions

Viveiros argues that the ALJ gave inadequate weight to her treating physicians' opinions.

Viveiros' treating physicians were Dr. Yufit, Dr. Douglas, and Dr. Doerr, and she asserts that each

of these physicians provided medical evidence to support a finding of disability. Treating

physicians' opinions are generally controlling, since "these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture" of the claimant's medical

impairments.  20 C.F.R. § 404.1527(c)(2).  However, the ALJ is not "obligated automatically to

accept" their conclusions.  Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998); see Tremblay

v. Sec'y of Health and Human Servs., 676 F.2d 11, 13 (1st Cir. 1982) (rejecting a "per se rule" that

treating physicians' opinions should be given controlling weight).  The ALJ gives controlling weight

to the treating physician's opinion only if the opinion "is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence" in the case record.  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not give the treating physician's opinion controlling weight, he must consider

the following factors in determining the weight to be given to that opinion:  1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence in support of the medical opinion; 4) the consistency of the medical opinions reflected in the record as a whole; 5) whether the medical provider is a specialist in the area in which he renders his opinions; and 6) other factors which tend to support or contradict the opinion.  See Guyton, 20 F. Supp. 2d at 167 (citing C.F.R. § 404.1527(c)(2)(I) – (c)(6)).  In addition, an ALJ is free to piece together relevant medical facts from the findings of multiple physicians; one doctor who gives an overview of the claimant's entire case is not necessary.  See Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).  Finally, the ALJ must provide "good reasons" for the weight given to the treating physicians' opinion.  20 C.F.R. § 404.1527(c)(2).  In fact, "where the ALJ fails to explicitly indicate the weight given to all relevant evidence, the reviewing court cannot affirm the Commissioner's decision."  Nguyen v. Callahan, 997 F. Supp. 179, 182 (D. Mass. 1998) (internal quotation marks and citation omitted).  By failing to do so, the ALJ makes it "impossible to determine whether he merely discredited that assessment or, in fact, overlooked that . . . evidence most supportive of [the claimant's] claim." Id.

The ALJ made no mention of what, if any, weight he gave the opinion of Dr. Douglas, one of the treating physicians, when discussing the weight he afforded the opinions of the other doctors whose notes are in the record, but could do so on remand.  The ALJ's failure to address the weight he gave to Dr. Douglas' opinion calls into question whether he gave proper weight to the other treating doctors' opinions because his report lend some support to the opinions of those other treating physicians.  The ALJ stated that the opinions of Dr. Yufit and Dr. Doerr were unsupported by their own treatment records and by the overall record of evidence.  R. 16.  Dr. Yufit's opinion

on Viveiros' back pain is supported by medical tests performed by Dr. Douglas, such as MRIs taken in 2006.   R. 228.   The ALJ acknowledged that Dr. Douglas treated Viveiros and found mild limitations on her range of motion. R. 14.  In addition, Dr. Yufit mentioned Viveiros' depressive symptoms in 2005 and 2007, R. 219, 221, as well as his medical source statement from 2009, R. 354; this is consistent with Dr. Douglas' findings of depression in 2007, R. 227, 229, 230.  The ALJ also stated that Dr. Yufit's forms were "vague and non-specific."  R. 16.

The ALJ should have explicitly stated how he weighed Dr. Douglas' opinion in assessing Viveiros' record.  Although Dr. Douglas only treated Viveiros for six months, this is a consideration that the ALJ should have taken into account when assessing the Guyton factors of how much weight to afford a treating physician's opinion; it does not justify omitting any explanation with regard to that opinion.  Although the ALJ cited Viveiros' treatment with Dr. Douglas elsewhere in his opinion, R. 14, he should have stated whether he gave Dr. Douglas' opinion controlling weight, and if it was not controlling, then how much weight he afforded it in light of the Guyton factors. Without any statement about the weight given to Dr. Douglas' opinion, the ALJ's assertion that the opinions of Dr. Yufit and Dr. Doerr are unsupported by the overall record cannot be affirmed.  Accordingly, the ALJ on remand should address each treating physician's opinion.

### 3.	RFC Assessment

Viveiros argues that the ALJ erred in his RFC assessment.  In addition to the omission of moderate difficulties in concentration, persistence, and pace discussed above, she makes two other arguments: a) the ALJ failed to take into account Viveiros' prior claim for Social Security disability benefits; and b) the ALJ erred in finding Viveiros' subjective statements about her condition not credible.

### a.      Viveiros' Previous Claim

In Viveiros' previous claim for SSDI, a federal district court affirmed a different ALJ's finding that Viveiros' impairments, both separately and combined – including vision problems, chronic pain, and migraines – did not render her disabled.  Viveiros v. Astrue, 2009 WL 196217 at *6.  An ALJ is "entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether claimant was disabled at the time of [the claimant's] second application."  Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 193 (1st Cir. 1987).  However, all the evidence presented in the prior matter was not necessarily relevant to the claims that Viveiros asserted in this case.  It was noted during Viveiros' hearing in the present case that her 2003 surgery and its after-effects were the "essence" of her first claim, R. 29, 31-32; her present claim emphasizes different symptoms.  Accordingly, the ALJ did not err in not incorporating all evidence from her prior (fully adjudicated) claim in this case.

### b.      Viveiros' Subjective Statements

Viveiros argues that the ALJ erred in finding that her statements regarding "the intensity, persistence and limiting effects" of her symptoms were not credible.  R. 13.  When assessing a claimant's subjective complaints, a court must take into account six factors:  (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) factors precipitating and aggravating the pain; (3) type, dosage, effectiveness, and side effects of any pain medications; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities.  Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986); see also Berrios Lopez v. Sec'y of Health and Human Servs., 951 F.2d 427, 429 (1st Cir. 1991).

However, failing to specifically discuss each of these factors does not constitute legal error.  See Braley v. Barnhart, No. 04-176-B-W, 2005 WL 1353371, at *6 (D. Me. June 7, 2005) (finding that there is no obligation for the ALJ to "slavishly discuss" each Avery factor).

The ALJ did not err in finding Viveiros' subjective statements were not credible.  He gave adequate reasoning for his finding, discussing Viveiros' medical record and the comparisons between her statements at the hearing and those statements and opinions given by her physicians. R. 13-15.  In addition, the ALJ specifically asked about the nature of Viveiros' pain, R. 32-33, 44, 49, precipitating and aggravating factors, R. 31-32, her medications and their side effects, R. 41-42, her functional limitations, R. 34, 37-38, 40-41, 47, and her daily activities.  R. 42-45.  The ALJ's treatment of Viveiros' subjective statements was sufficient for him to conclude that her statements were not credible.

### 4. Viveiros' Medications and Their Side Effects

Viveiros argues that the case must be remanded because the ALJ did not fully discuss the medications she was taking or their side effects.  In her April 2007 Disability Report, Viveiros reported that some of her medications caused dizziness and fatigue.  R. 133.  In addition, Dr. Douglas wrote in his July 2007 appointment notes that since she began to take Nortriptyline for her migraines, Viveiros had become more nauseous and emotional.  R. 227.  Accordingly, Dr. Douglas instructed her to stop taking Nortriptyline.  Id.  The ALJ acknowledged that Viveiros was taking prescription medications for both her migraines, R. 10, and her myofascial pain.  R. 14.  He also noted that although Viveiros stated that she was taking a medication for depression, there is no record of Dr. Yufit having prescribed it.  R. 13.  The ALJ noted that Viveiros discussed taking medication for depression with Dr. Douglas, but that she was reluctant to take it because she feared

weight gain.  Id.   The ALJ did not discuss any side effects Viveiros was experiencing from her medications in his written opinion.

The ALJ's treatment of Viveiros' medications and side effects does not warrant remand.  An ALJ's failure to address side effects of medication is not sufficient grounds for remand where the claimant fails to develop the significance of same.  Lacroix v. Barnhart, 352 F. Supp. 2d 100, 115 (D. Mass. 2005).  The ALJ specifically asked Viveiros about side effects from her medications during the hearing.  She replied only that the medications make her vision "blurrier" and that her allergy medicine causes her to feel tired.  R. 41.  Similar to the claimant's testimony in Lacroix, Viveiros' testimony was insufficient to suggest that her side effects caused impairments greater than those found in her RFC.  See Lacroix, 352 F. Supp. 2d at 115. None of Viveiros' doctors noted that her side effects caused functional limitations.  See Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002) (finding that drowsiness is a typical side effect of medications and that it should not be viewed as disabling "unless the record references serious functional limitations").

### 5.      The ALJ's Duty to Develop the Record

Viveiros argues that the ALJ had a duty to help develop the record in her case, specifically by obtaining a medical source statement from either a treating or consultative physician to assist in determining her RFC.  "If the evidence does not support a treating source's opinion . . . and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." SSR 96-5p, 1996 WL 374183, at *6 (July 2, 1996). While the claimant ultimately bears the burden of proof on the issue of disability, the adjudicator "nonetheless retains a certain obligation to develop an adequate record from which a reasonable conclusion can be drawn." Carillo Marin v. Sec'y of

Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

Here, however, the ALJ did not have a duty to develop the record further by obtaining medical source statements from Viveiros' treating physicians.  The ALJ would only be required to do so if he could not "ascertain the basis" for these physicians' opinions.  Appointment notes written by Dr. Doerr, Dr. Douglas, and Dr. Yufit, along with Dr. Hirsch's report from her psychiatric evaluation, provide the basis for each of their opinions.  The ALJ could reasonably conclude that obtaining additional medical source statements would not add new evidence given that Viveiros' impairments were discussed in detail in the rest of her medical record.  Compare Ribeiro v. Barnhart, 149 Fed. Appx. 7 (1st Cir. 2005) (holding that ALJ had no duty to develop the record by requesting more information from a treating physician because claimant was represented by counsel and "the extent of her impairment was not undeveloped by the record as a whole") with Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991) (finding that the ALJ breached his duty to develop the record in the absence of any records from the treating physician and when claimant was unrepresented by counsel).  In addition, Viveiros has not specified the issue on which additional medical source statements would provide insight.  She failed to assert the need for additional medical source statements earlier in the proceedings – either in her application or during her hearing – which lessens the ALJ's duty to develop the record.  See Coleman v. Astrue, No. 09-8-P-H, 2009 WL 3517583, at *2 (D. Me. Oct. 29, 2009) (finding that the ALJ had no duty to develop the record when claimant did not present the argument at the time of application or hearing, even if evidence to support the argument appears elsewhere in the record). As a result, there was no need for the ALJ to recontact Viveiros' treating or consultative physicians for additional medical source statements.

## V.        Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED in part and DENIED in part and Viveiros' motion to reverse is GRANTED in part and DENIED in part.  This case is REMANDED to the ALJ with instructions to, after any proceedings that may be suitable: (1) conduct another hearing, specifying in his questions to the VE the moderate difficulties in Viveiros' concentration, persistence, and pace; (2) reassess and address the weight given to Dr. Douglas' medical opinion in determining Viveiros' RFC; (3) reassess Viveiros' RFC in light of her moderate difficulties in concentration, persistence, and pace, as well as the weight to given to all the treating physicians' opinions; (4) reassess, based upon that RFC determination, whether Viveiros can return to past relevant work; and (5) if necessary, complete the sequential evaluation process to determine if there is other work Viveiros could perform and, in doing so, obtain and consider VE testimony that addresses hypothetical questions that include all of the limitations supported by the record.

**So ordered.**

/s/ Denise J. Casper
United States District Judge